| Rhode Island Hospital<br>Trust Company,<br>Executor and Trustee,<br>vs.<br>Edward L. Myers,<br>Executor | P. A. No. 1142. |

June 4, 1931.

CHURCHILL, J. This is an appeal prosecuted by the Rhode Island Hospital Trust Company, executor and trustee, from a decree of a Court of probate admitting to probate an instrument in writing purporting to be the will of John Johnston, of Woonsocket, R. I.

The principal questions raised by the reasons of appeal are, the capacity of John Johnston to execute a will, and, whether the will was procured by undue influence.

The testator was about eighty years of age. He sustained a fracture of his hip on Tuesday, November 6, 1928, was taken to the Woonsocket Hospital the same day and remained there until the afternoon of Tuesday, November 13, 1928, when he was taken to his home. The instrument in question was prepared on the morning of November 14, 1928, by P. Francis Cassidy, a

member of the Bar. The instrument was executed at about 10:00 A. M., the testator's mark being affixed thereto. He died about 11:40 A. M. the same day.

John Johnston was of Scotch ancestry, and a man of force of character and resolution. His wife had died some years previously and his immediate family consisted of twin children, Isabella and John. They were about 50 years of age, unmarried, and lived at the home with the father.

The testator had been engaged in the shuttle business during the greater part of his life, and owned two valuable pieces of rental property situated in Woonsocket; the Johnston Block and the Gilbert Chambers. These properties were mortgaged.

The relations between the children and the father were not harmonious. The son was addicted to drink and apparently possessed little business capacity. The father took exception to the persons with whom his daughter associated. No effort was made on the part of the proponent to show that the father's disapproval of the conduct of his children was not well founded.

Moved by these considerations, and after consultation and advice, the testator on February 26th, made a will providing for the disposition of his property in trust for the benefit of his two children. This instrument named the Rhode Island Hospital Trust Company as his executor and trustee. Provision was made for the payment of the mortgages on the property, for their operation and management, and the net income was, subject to the redemption of the mortgages, to be paid two-thirds to the son and one-third to the daughter. The matters of marriage of the children, survivorship and issue of the children were adequately dealt with. The Ballou Home was given a bequest of $1,000.00.

There is abundant testimony showing that up to October, 1928, the testator

expressed his satisfaction with the disposition which he had made of his property by his will of February 26th, 1924, and that he felt it wise to protect the interests of his son and daughter by the arrangement which he had made.

There is some testimony on the part of Isabella and of John, and of Mrs. Bener B. Park, of conversations in which the father discussed the possibility of a different disposition of his property, whereby the property would be left in equal shares to the son and the daughter.

On the weight of the evidence, however, I find that the testator had a well-matured, carefully prepared plan for the disposition of his property as embodied in his will of February 26th, 1924, and that there is affirmative testimony that he remained satisfied with the scheme of disposition as laid out in the will of 1924 up to October, 1928, and that there is no reliable testimony showing that he entertained a serious desire to make any substantial change in the testamentary disposition made by him in 1924, at least up to the time he entered the Woonsocket hospital on November 6th, 1928.

At this point it is pertinent to examine the terms of the instrument executed by him on November 14th, 1928, and now offered for probate.

Edward L. Myers, his attending physician after he left the hospital, was made executor; the bequest to the Ballou Home was increased to $1,500.00; all the rest of the estate was given share and share alike to John and Isabella outright.

With this background we come to the facts bearing on the capacity of the testator and the circumstances surrounding the execution of the instrument of November 14th, 1928, now propounded for probate.

The testator was taken to the Woonsocket Hospital on Tuesday, November 6th, 1928, after an X-ray photograph had been taken. He had suffered "an

infra capsular fracture of the thigh, fracture of the femur inside the capsule * * * * very close to the (hip) joint,", to use the words of his attending physician, Dr. Elisha D. Clarke. Dr. Clarke also testified that Johnson had a "chronic heart condition," and that on the following Wednesday he was not "taking his nourishment well."

From the time he entered the hospital until he was taken away at 3:45 P. M. on Tuesday, November 13th, 1928, he grew weaker, physically and mentally. His mental condition was characterized by fits of violence and great excitability, on one occasion the nurse describing him on the hospital chart as "irrational." This condition was varied by periods of sleep or unconsciousness. The proponent ascribes his mental condition to the effects of morphine and to the discomfort caused by the fact that his leg was confined in a plaster cast. But whatever the cause, the fact remains that his condition, physical and mental, underwent a progressive impairment.

His daughter Isabella insisted that he be removed from his hospital to his home. This was done against the advice of Dr. Clarke, who was of the opinion that such a change was dangerous to the patient. He was, nevertheless, removed to his home on the afternoon of Tuesday, November 13th, 1928. His condition at this time is a fact of importance, since he died within less than twenty-four hours and the will was signed during that interval.

Dr. Clarke saw him at 2:00 P. M. for the last time. The patient was lying in bed with his mouth open, breathing heavily and noisily. He had the characteristic pinched look around his nose, and his heart was working badly. Dr. Clarke diagnosed his condition as "comatose" and testified that he was "too near death to be transacting business." The chart, kept by the nurse, Miss Donaldson, at the hospital, shows that at 12:00 o'clock (it)

"seems hard for him to swallow." 1:00 o'clock, "Asleep;" 2:00, "Dr. Clarke visited and advised against taking him home." 3:45, "Taken home in ambulance against advice. Condition very poor." Miss Donaldson testified that he was semi-conscious at that time and that he was in the weakest condition she had seen him in since his arrival at the hospital.

Dr. Edward L. Myers, the physician attending the patient after he arrived home and under whose care he was during the time when the will was prepared and executed, is in substantial agreement with both the attending nurse and Dr. Clarke respecting his condition on removal to his home. He had seen him at the hospital previous to his removal and testified finally that his mental condition at times while in the hospital was very much impaired, and that in his opinion his condition on Tuesday, the 13th, was such that he would not live twenty-four hours after his removal unless his treatment was changed.

As bearing on the reliability of Dr. Myer's testimony generally, it may be pointed out that on direct examination he stated that the testator was 100% mentally fit while in the hospital, but on being confronted with his testimony given in the Probate Court was obliged to admit that the testator's mental capacity was much impaired.

On all the testimony it is clear that at the time of his removal from the hospital, John Johnston was fast approaching dissolution and that he was clearly incompetent to make a will.

Did his mental state improve to such a degree of intelligence and understanding as to render him competent to make the will in question?

Disregarding for the moment the opinion of Dr. Myers as to the condition of John Johnston after he was brought to his home, it is important to take into consideration the testimony of the nurse at the home, Miss Curran, called

in by Dr. Myers, and who is a disinterested and skilled observer.

On the arrival of the testator at his home from the hospital at about 4:00 P. M., on November 13th, the cast was removed from his leg and Miss Curran and a Miss Spencer, an experienced nurse and an assistant to Miss Curran, endeavored to make the patient as comfortable as possible. Miss Curran did not speak to him nor he to her. She left at 6:00 P. M. and returned about 6:30 P. M. and was on duty until 8:30 the next morning, that is, the morning of the day on which the instrument in question was executed. She stated that Johnston lay in a sort of stupor, breathing heavily, and that his position was changed by the nurses at times in order to make him more comfortable, and that the only bodily movement he made was with his hands; that when his daughter was in the room she heard him murmur when his daughter spoke to him; that he had no solid food and that he was fed with a spoon or a tube. During the night he had a serious heart attack and the nurse called Dr. Myers at about 2:00 o'clock on the morning of the 14th, received instructions to give him a heart stimulant, and later, when this had no effect and the patient's pulse grew weaker, she again called Dr. Myers in the early hours of the morning.

Miss Curran left the house for breakfast about 8:00 o'clock and at that time Johnston was, as she characterized it, a very sick man, very weak and in a stupor. She did not return until just after Johnston died, about 11:40 A. M.

While it is true that the witness on cross-examination became somewhat confused and admitted that she had testified in the Probate Court that the testator was able to talk rationally and intelligently as far as she could see, and that he could be roused from the condition which she described as a stupor, it still remains true that of all the witnesses who described John

Johnston's condition while at his home, her testimony remains the most convincing to this Court, in view of her disinterested position, her opportunity to observe, and her skill in observation.

Moreover, her testimony is consistent with the uncontradicted testimony as to the condition of John Jonston at the hospital at 3:45 P. M. on the 13th of November, just preceding his removal to his home, and is consistent with the prognosis of Dr. Clarke at 2:00 o'clock on the 13th of November at the Woonsocket Hospital.

Miss Spencer, the other nurse, was not called by either side.

Dr. Edward L. Myers saw his patient four times from the time he came home until the time of the execution of the will at 10:00 A. M. on Wednesday, the 14th of November. He saw him at about 4:00 P. M. just as he arrived home; at about 7:00 P. M.; at 10:30 P. M. and at 8:30 on the morning of the 14th of November.

At 4:00 P. M. he asked Johnston a few questions, among them if he knew he was at home, to which the patient answered "yes." He made no effort to test him mentally at 7:00 P. M. or at 10:30 P. M., and stated that on these three interviews he forbore to question him further because of his weakened condition. When he saw him at 8:30 on the morning of the 14th, he (Dr. Myers) knew a will was to be executed; he testified that Johnston answered several questions correctly and intelligently and that he looked as though he had been through something (referring to the heart attacks of the night before), but that he was possibly a little better physically than the day before and that his mental condition was as good as before the accident on November 6th, 1928. Dr. Myers ascribed the impaired mental condition on Tuesday, the 13th, to the fact that morphine had been used, and to the irritation caused by the use of a cast, and

to the treatment received at the hospital.

Dr. Myers, in addition to his interest as an executor, was a pronounced partisan in his bearing on the stand. His medical testimony was further colored by the fact that apparently he had become involved in a professional controversy with Dr. Clarke over what he (Dr. Myers) regarded as improper treatment of Johnston at the Woonsocket Hospital. Some of his testimony, particularly that as to the condition of his patient on the morning of November 14th, appears incredible in view of the uncontradicted testimony as to the severe heart attacks suffered by Johnston the night before, and when weighed in the light of the reliable medical testimony in the case that his patient was suffering a progressive deterioration both physical and mental. His testimony is opposed to the great weight of the medical testimony given by Doctors Clarke, Donley and Griffin, and the nurse Miss Curran, and is contrary to his own admission as to the gravity of the case on the afternoon of November 13th, 1928.

In view of these considerations the Court can not accept the testimony of Dr. Myers as to the physical condition of the testator on the morning of November 14th or his opinion as to testator's mental condition on that day.

According to Isabella Johnston, while she and her brother John were in the sick room, about 7:30, the father stated he wanted to make a will before he passed away; that then, in answer to a series of questions put to him by his daughter, he stated he wanted to make a will like "the one of last year" giving his property "50-50"; that he wanted Mr. Cassidy to draw it, and that he wanted Isabella to take the outside work and Jack the inside work. She then called Mr. Cassidy on the telephone, saying he was to come to the house. Parenthetically it may be pointed out here that

Mr. Cassidy called Dr. Myers that night and inquired as to the condition of Johnston and, as a result, deferred his visit until the next morning. Isabella further testified that her father was not in a stupor and was much better than when in the hospital. Her brother, John, testified in substance to the same facts as his sister.

The testimony of both witnesses is open to grave doubts and can not be accepted as trustworthy. Isabella, much the stronger character of the two, was obviously a highly interested witness, and the brother was evidently much under her domination. Space forbids giving instances of self-contradictions in the testimony of Isabella; the numerous instances where her testimony on vital points was inconsistent with her testimony given in the Probate Court. The cumulative effect of such self-contradiction was such as to shake belief in the reliability of her testimony.

It may be further pointed out that the change in the testimony was in many instances in favor of the proponent and, in addition, the witness further weakened the effect of her testimony by her repeated answer in cross-examination that she did not remember.

The testimony of John, her brother, stands much in the same case. His mentality is evidently not strong and much of his testimony was a repetition of his sister's.

The testimony of these two witnesses, when weighed and taken into consideration with their bearing and appearance on the witness stand, can not be taken as showing or tending to prove either the competency of the testator, his physical or mental condition, or that he, in fact, stated how he wished his will drawn, or on any other material or disputed point.

Mr. P. Francis Cassidy, the draughtsman of the will, knew the testator but had never previously done any profes-

sional work for him. He was called by Isabella Tuesday evening, November 13th, between eight and nine o'clock and was advised by Dr. Myers that the patient was in no immediate danger but that he should not be disturbed until the following morning.

Mr. Cassidy saw Johnston about 8:45 the next morning. He was in bed, lying on his left side with his right arm exposed; in identically the same position as the witnesses to the will observed him at 10:00 o'clock that morning. He did not impress Mr. Cassidy as being a very sick man; in fact, he thought the testator might live "a considerable time." No one else was in the room. Mr. Cassidy then testified in substance that he called Johnston by his first name, told him that he understood he wanted him to draw a will and that, thereupon, the testator said his conscience troubled him, and upon being asked what kind of a will he wanted, said he wanted to leave all his property to his children, "my twin children," in equal shares; that "he wanted to increase a bequest he had made to the Ballou Home in a previous will of $1,000.00;" "he wanted to make it $1,500.00;" that he wanted Dr. Myers made executor; that other than the reference to the bequest to the Ballou Home he did not refer to a previous will or refer to his property except to say "all his property." Mr. Cassidy did not inquire as to any previous will made by him. This was the only time Mr. Cassidy spoke to the testator on the day the document he drafted was executed. He further testified that the testator was in his opinion rational and in a fit condition to make a testamentary disposition of his property.

Mr. Cassidy then went immediately to his office, drafted the will, and returned to the Johnston home with the will about 9:30. He met Isabella, who told him that her father was asleep and that all the witnesses had not arrived. He then instructed Isabella not to wake her father "but when the witnesses come and your father wakes up,—don't wake him yourself—take the will in to him, read over the will to him carefully, find out if he is satisfied with it, and if he is satisfied with it, take the witnesses in and ask your father again if he is satisfied with the contents of it. * * * * I told her then how to execute the will."

Mr. Cassidy did not know whether Isabella had had any experience in the matter of executing wills. He then explained to her the matter of executing the will by a cross. He testified "he hadn't any idea that he would be unable to sign his name," and that she (Isabella) did not refer to "how her father should sign;" that "if her father was not able to sign or didn't care to sign his name, to make a cross opposite the red seal, and if he made his cross for her to write the word 'John' to the left and 'Johnston' to the right, the word 'his' above the cross and the word 'mark' below the cross." He then gave further instructions as to the manner in which the witnesses should sign the document.

No question is made that Johnston was fully able to write his name when in his normal state.

The witness was in the house at that time above five minutes and then left, stating he had an appointment to go to Boston at eleven o'clock and that he had an appointment at his office. He admitted that, as a matter of fact, he had little business to attend to at his office at that time. After going back to his office and staying a short time, he took a taxicab and returned to the Johnston home and met Mr. Fanning, one of the witnesses, coming out of the sick-room. Isabella soon came out and told him that the will had been executed. He did not see the testator on that occasion, which was shortly after ten o'clock, and, af-

ter some conversation with Isabella, left the house.

Pretermitting inquiry at this point as to whether the testimony of Mr. Cassidy as to the mental and physical condition of Johnston is not outweighed by the medical evidence in the case, the question forces itself upon the mind as to whether the conduct of Mr. Cassidy, as testified to by him, can be reconciled with his testimony as to the mental condition of the testator and with his testimony in respect to the instructions claimed to have been given him. That he apprehended, with reason, difficulty in obtaining the signature of the testator is clear; that haste was urgently demanded is none the less clear. Without further comment on the facts, it is enough to say that the inference is irresistible that a situation had developed in the Johnston home on that morning which would not bear scrutiny. Mr. Cassidy did only what he deemed absolutely necessary and left the scene.

Viewed in this aspect, when weighed against the credible medical testimony in the case introduced by the appellant, the Court is constrained to say that the testimony of Mr. Cassidy that the testator instructed him, as he claimed, in respect to drafting a will, and his testimony as to the mental condition of the testator, is overthrown.

The instrument was presented to the testator by his daughter, Isabella, about 10:00 o'clock in the morning in the presence of the two witnesses to the will, William Fanning and Mrs. Bener B. Park. According to them, the testator was lying on his left side with his right arm exposed. Isabella took the will, which was lying on the bed, and said, "Pa; this is your will. I have read it to you. Is it satisfactory?" The father nodded his head. Then his daughter said: "Your witnesses are here, do you wish it executed?", to which he said "Aye" and nodded. Isabella then took the pen, dipped it in ink and put it in the testator's fingers. He, thereupon, according to the witnesses, made a cross on the document and Isabella took the paper to a table and wrote thereon "John Johnston, his mark."

As far as appears, the only word spoken by the testator in the presence of the witnesses was the word "Aye."

The testimony of the two witnesses to the will as to what took place in the sickroom when the document was signed by a cross does not advance the cause of the proponent in the matter of mental capacity. Both witnesses knew the testator and both testified that he apparently recognized them when they came into the room. Neither of them was in the room over fifteen or twenty minutes and the only word uttered by the testator in their presence was the word "Aye" when Isabella's questions were put to him.

To Fanning he appeared a very sick man. He admitted that at the trial in the Probate Court he had testified that he presumed Johnston was conscious.

Mrs. Park stated that when she entered the room and said good morning, the testator bowed his head and smiled and that he was conscious but weak.

The facts to which these witnesses testified, and which the proponent claims show the competency of the testator, are far from having such force.

It was shown by the testimony of an alienist of repute and experience that such acts as apparent recognition, nodding, saying "Aye" or "Yes' 'to questions, or smiling when spoken to, on the part of a person in the condition of the testator, are of small evidentiary value in the solution of the problem whether such person has sufficient intelligence to transact business, or to comprehend the nature of a transaction of such importance as the disposition of property by will.

As far as the testimony discloses nothing further was said by the testator in his lifetime after he said "Aye"

just before the cross was affixed to the document. The exact time of his death is not clearly shown but, in any view of the testimony, he did not survive over an hour and forty minutes after the document was presented to him. The proponent and the appellant both introduced the testimony of reputable and skilled physicians and alienists in support of their respective contentions. Their testimony was based on the usual hypothetical questions embodying assumed states of fact in respect to the testator's mental and physical condition from the time he entered the hospital until the time of his death.

As found by the Court herein the assumed states of fact on which the experts for the proponent gave opinions in favor of the competency of the testator did not in truth exist. All of the expert witnesses substantially agreed that the testator was not in a mental state fit to execute a will on November 14, 1928, when the essential facts were submitted to them. There is a substantial concurrency of all the reliable medical testimony on this point.

Taking the entire testimony in the case into consideration, the Court finds that the preponderance of the evidence establishes the facts to be that at the time the cross of John Johnston was affixed to the instrument now propounded for probate, he, the said John Johnston, did not possess sufficient understanding or intelligence to transact business of any character, nor to understand the nature of the act he was doing when his cross was affixed to the instrument in question; nor did he comprehend or was he capable of comprehending the nature or contents of such instrument; and that he was not able fairly and rationally to consider the character and extent of his property, the condition in which it was, or the persons to whom or the manner and proportons in which it should be disposed of by will.

The Court therefore finds that John Johnston was not sane nor of sound and disposing mind and memory at the time his cross was affixed to the instrument now offered for probate and dated November 14, 1928, and rules that such instrument is not entitled to probate as his will.

For appellants: Tillinghast & Collins.

For appellees: Walling & Walling.